Ms. Jennings. Good morning. May it please the court. My name is Deborah Jennings. I, along with esteemed counsel Ms. UA Lewis, represent the estate of John Allen et al. Your Honor, this is our second time before this court, having been before this court and at the University of Mississippi. Here we are today, Your Honor, faced with the very same or similar issues that we were confronted before the court in Mississippi, my home state. The 1286 issue is the issue before this court, and in a civil rights case such as this, the question is decided based on the standards set forth in the cases of Ashcroft v. Iqbal and Bill Atlantic v. Twombly. That is, whether or not we have pled a plausible claim. Now, the plausible claim standards are different in two instances. One, when you're dealing with the individual actor, the standard is that of a heightened pleading standard, as the court is well aware. When we're dealing with governmental officials acting in their official capacity or dealing with municipalities, the standard is the fair notice standard. And so what we have planned, Your Honor, in the third amended complaint is fact specific. It's fact specific because what we have here today is a situation where an unarmed gentleman was driving late at night and he was stopped. And during the course of that stop, he made a complete stop of his vehicle and he was asked on one hand with competing commands from one officer with different commands to another office. The purpose of the stop was a broken taillight and running the stop sign. Now, I wanted to clarify that with you. Do you concede that the, I understand you concede that the taillight was broken. No, Your Honor. Without due respect, we do not make that concession. I guess I've just got to clarify that then in the record because I understood you initially disputed that it was broken, but then you conceded in one of your papers that it was broken. So you're saying that isn't the case? That is not the case, Your Honor. The taillight was not broken. He was stopped in the matter and during the course of that stop, the competing commands from Officer Selena on the driver's side versus the competing commands from Officer Hayes on the passenger's side. As we have discussed, the window was not functional on the driver's side. So Mr. Allen put his fingers in his pocket seeking to pull out what most people would ordinarily expect at a traffic stop, the driver's license. And Mr. Allen was in a precarious position because while he had his fingers in his pocket. Again, you're limited to the facts you've pled in your third amended complaint. I just want to make sure you're doing that. You're not going outside your third amended complaint. Thank you, Judge Barstow. And Officer Selena is not a party any longer, is she? No, he's not, Your Honor. Right. Okay. And so having said that, Your Honor, the officer told Mr. Allen to stop reaching and Mr. Allen had his finger in his pocket, didn't know what to do. There was repeated commands and he was stifled. How can you plead if in fact you do plead he didn't know what to do? Is that literally in your third amended complaint? He did not know what to do? The hesitation may have been because of the confusion, the communications from... Well, but again, you need to limit yourself to the allegations in your third amended complaint and don't be adding or making conclusory statements. That does us no good. Yes, Your Honor. Thank you. And so six gunshots were fired and those six gunshots landed on Mr. Allen's head, his arm, his fingers, and his chest. Of those six, five landed and during the course of that traffic stop there was a determination made after the traffic stop whether or not there was a weapon. And the determination was made by the officers at the scene that there was no weapon present in the vehicle. Two days later, Officer Palatino determined that there took photos and those photos indicated that there was a weapon two days later. But every officer at the scene and there were at least five or more officers at the scene who inspected the vehicle and determined... I just want to be clear. There seems to be these different versions of kind of whether there was a weapon and where it was, but there is no indication there was a weapon in his pocket or where his hand could have reached right at where he was sitting. There's some indication about it being in the back or in the glove box, but nothing that shows it was around him where he could have reached it and shot at the officer. Absolutely, Your Honor. Okay, there's no indication even though there seems to be a lot of difference, fact dispute about whether there was a gun at all and where there was one. There is no nobody who says it was right there at his side or in his pocket. Is that correct? That is absolutely correct, Your Honor. Is that an allegation in your third amended complaint? That was raised in... A dispute between anybody that there was no weapon right on the body of the decedent? There was a dispute, but that dispute was raised after the fact? Maybe I didn't follow you. Well, what I'm just trying to keep us capping to is the allegations in your third amended complaint since this was a, since the district judge did grant the motion to dismiss 12b-6. That's why we need to be so careful. About what what you're presenting to us. Yes, Your Honor. Well, you plead that he was unarmed and that he had not committed any crime. That's what you plead on ROA 1113 is what I'm looking at. Yes, Your Honor, we did. But I agree you didn't, you need to limit it to that, but I'm just looking at what you did. Will do. And so this obviously led to the death of Mr. Hayes, Mr. Allen, and the location is critical of where the gunshot wounds landed on his body. There's a number of the Baker versus Putnam case I think is an important case as it relates to this particular case. This case is similar in many respects, but the issue that distinguished this case from Baker is whether or not Mr. Allen in fact possessed a weapon. And so, uh, there have been various views on whether or not he possessed a weapon. There obviously we discounted the testimony of the passenger, Ms. Chantelle Atterbury. We discounted that because although she was in custody on that day, she indicated that. Please, ma'am, you really need to stick to the allegations in the third amended complaint. Why you discounted the testimony of the passenger, et cetera, et cetera, unless that is specifically pled in your third amended complaint. We can't deal with that. All we can deal with is the judge threw your case out based on the allegations in your third amended complaint, or that's what he was supposed to do in ruling on a motion to dismiss based on Rule 12b-6. But he's supposed to do it, Your Honor, unless we plead, we do not plead plausible facts. Exactly. There's no question about that. We beg to differ with the court's assertion. We plead plausible facts. The court concluded there was three gunshots. We, and what we saw was five gunshot wounds, and the injuries were five gunshot wounds. This was a short encounter. While we recognize that officers encounter tense situations, but this wasn't something that was a fleeing felon. This wasn't a situation involving someone who posed an immediate threat of harm to others or to third parties or to the passenger. This was a situation, Your Honors, that there is no evidence of any threat of harm. And so with that, and we pled that, Your Honor, in the third amended petition, a complaint, I'm sorry, we pled that fact. And so where we are now, Your Honor, is the Baker versus Putnam case, while it may be distinguishable on certain grounds in our case, but it's more in line with what happened here. And so in addition to that, Your Honor, the court is confronted with some material issues of fact. If we don't treat it as a 12b-6 and we convert to a summary judgment, the material facts here is whether or not . . . Wait. You converted this to a summary judgment? No, Your Honor. I said if the court were to convert, we submit to this court . . . That's why we reversed the judge the first time around, because he did convert it to a summary judgment. I don't believe you're making that contention in this appeal, are you? Absolutely not. Absolutely not. The contention we're making is based on what the appellee and what we have argued also. This has been eight years of this case, and we're still at the 12b-6 stage. It shouldn't be this way, but I'm pointing . . . You waited the full amount of the time under the statute of limitations to file your action, so that discounts that somewhat. Well, it may well do, but not eight years, Your Honor. Where we are here, Your Honor, is at the 12b-6 stage, we have satisfied the requirements of Iqbal and Tuamu. We've met our burden . . . All right. And your initial time, your time has expired, and we'll hear now from Ms. Lewis. Thank you, Your Honor. Thank you, Ms. Jennings. Thank you. May it please the Court. I am Mae Lewis, and I would just like to continue and fill in a few gaps here. This is a 12b-6 motion that was granted by the district court after remand by this court, and we believe and we are asking this court to find that there actually were plausible facts. And on what? Because the problem is your original brief doesn't cover every single thing that's in your complaint. Then your opponent kind of covers a lot of that, and then you're a little bit unclear. So I want to make sure that I understand what causes of action against whom are you contending should be back in the district court versus maybe there's some where you're not trying to undo the dismissal. Yes, Your Honor. So one of the main claims, obviously, is the claim against Officer Hayes. We believe that we have pled strong claims, if true, would overcome an issue of qualified immunity and allow us to move beyond the motion to dismiss stage. We also believe that we have pled plausible facts to overcome our Monel claims that we have alleged, as well as ADA claims. As it relates to the Monel claims, as my co-counsel stated, the standard for that pleading is a little bit different. It's not a heightened pleading standard, and we believe that based on the facts that we provided as it relates to the other incidents that have happened with City of Houston and allowing their officers to continue to engage in activity that's similar to this type of activity as far as constitutional violations without discipline, without retraining, and has been the moving force behind the continual constitutional deprivations of other individuals that the Houston police have encountered. As it relates to the ADA claim, I would like to point out that Mr. Allen was considered a consumer, and Houston PD, a mental health consumer, is somebody who is registered with the city, and that is in our complaint, and it's known that this person has a mental health concern that you should proceed with caution is the gist of it. And so we believe that we have pled plausible facts as it relates to the ADA claim in that regard as well. What, that these officers knew about that? Well, Your Honor, we believe that in running the plates that it is more likely that they were aware, and forgive me, I don't have the case in front of me right now, but there is a case that this court recently decided where there was a young man who was a school student, and the resource officer there, he, the court found that the jury could consider, well, may understand that this officer could have known that this child had a disability as it relates to his mental disability, and forgive me for not having that case before me, but I didn't, but that is the gist of the case is that it was something that should not have been decided at the 12B6 stage, and I believe that that's something that we could flesh out at a later stage as it relates to the ADA claim and this officer, whether this officer knew. What are the bases for your seeking recusal of the district judge? Well, Your Honor, this court, as you know, we're back here once again, and I, in this particular instance, I believe that we will not have an impartial judge when we return. Based on what? The reason why is because the response to the court once we did return after the first time. The first time that this case was remanded, the response from the court was that of impartiality. He was quick, we still, we didn't get anywhere as it relates to the discovery, and obviously, case law was different at that time. I understand that there's new case laws since then. We didn't get, I believe, honestly, I believe that this court has other cases that . . . I'm sorry, the district court has other cases that this court has recognized that he has been fundamentally unfair in as well, and I believe in this particular case, this court can rely back on his other opinion, on the previous opinion in this case, and found that he was fundamentally unfair the first time around. You all said so in your opinion on the first time that Judge Hughes was fundamentally unfair in the way that he proceeded in that particular instance, and now that we're back here again and returning, I don't believe that he has the ability to be impartial in this case, or give a sense of fairness in this particular case. All right, I believe we have your answer, and you say five minutes for a vote. Thank you. Thank you, Ms. Lewis. Mr. Higgison? May it please the court, I'm Robert Higgison, representing all of the appellees. This appeal can be broken down into state claims and federal claims, and the federal claims can be further broken down into the claim against Officer Hayes and the Monell claims against the city, and then there's . . . This is a very small point, but we have inconsistent spellings of Officer Hayes. Is there an E or not? Your Honor, I understand the frustration over that, and there is . . . I wrote it down for myself, because I have spelled it both ways. Many of us have spelled it both ways, and I wrote it down specifically. There is an E. All right, thank you. H-A-Y-E-S, and my apologies for all the spellings throughout this record, from maybe from both sides. I'm not sure. Thank you. Well, he knows that both spellings are referring to him. Both spellings are referring to the same person, yes, Your Honor. Okay. You were telling us about the federal cases you think we have against Hayes, and then the Monell against the city. What is it that you want to say about that? Yes, the case against Officer Hayes and the Monell case against the city, there are many things that can be said about why there is no Monell claim here. First, I want to address this procedural issue, though, that Judge Barksdale has raised, and that is about whether this was converted to a summary judgment. It was not overtly or expressly done so, and that is what got it sent back last time because of the lack of adequate notice in the procuratorial opinion. He mentioned in that opinion that there wasn't enough notice that he would use the video or the affidavit of Officer Hayes, and this time there was plenty of notice, and the parties gathered in the courtroom with the judge, watched the video together, watched the video that plaintiff's claim is an altered video, and the original video. They all watched them in the courtroom together, and the judge considered that. The plaintiffs referred to the video in their complaint, including the third amendment complaint, and so that was before the court legitimately. The plaintiffs were, there was some issue about where the video went the first time around. It disappeared somehow with the judge, and this time we knew that we had provided the video to the plaintiffs, and at the conference in March of 21, when they watched the videos, the judge asked the plaintiffs to present, to file that video and the video that they claim is the altered video, and they did so on April the 9th in a USB drive in a folder. It's filed in the record. This court should have it. You can watch the video and see exactly what went on and what Officer Hayes . . . Was the video attached to the third amended complaint? No, it wasn't attached to it. It was referred throughout. Okay, so it incorporated. Yes, incorporated. Yes, Your Honor. Right, so we're here on a motion to dismiss, aren't we? So it appears, at least officially, that's what it is. All right. So the question should be, have they pleaded enough to overcome qualified immunity? Have they pleaded a claim? They haven't pleaded a claim enough to overcome qualified immunity for Officer Hayes because in their third amendment complaint, they acknowledge that Mr. Allen did not do what Officer Hayes told him to do. And if you watch the video the way that District Judge did, you'll see that Officer Hayes said to him six times, stop reaching in your pocket. And also there was a question last time around about the affidavit of Officer Hayes and how that got into the record. I can answer that question today. Plaintiffs attached the affidavit of Officer Hayes to their supplemental motion for relief from the judgment. Plaintiffs inserted Officer Hayes' affidavit in the record, so that was before the judge, and it wasn't attached to the record. On which occasion, the first motion to dismiss or the second? The first one. But after that judgment, after it already ruled and they said, here, take this. Here's an affidavit of Officer Hayes. Here's why you should rule for us. That's still in the record, Your Honor. It wasn't attached to their complaint. It was attached to a motion. It's evidence that they put in the record. Right, but it's the third amended complaint. It's not in the third amended complaint, then. It's not attached. They have made numerous references, however, in their third amended complaint as well as here today. Right, so they've incorporated that as well. I believe that they have. They have talking about the disputes about what the officer said and Officer Hayes' affidavit about what he said and what Mr. Allen was doing are incorporated by reference in their third amended complaint. The video, then, shows that Mr. Allen was reaching for something, which Officer Hayes perceived to be him pulling a gun out. And Judge Haynes, to your question about the proximity of the gun and where it might have been, the gun, under precedent from this court, the gun doesn't even have to be there. No, I'm well aware of that. I'm simply saying that in terms of what was proven, there wasn't a gun. But I understand that if a police officer is telling me something and I reach in, that he might think I'm pulling a gun. I'm well aware of those cases. But here we have two officers in this argument that he's telling Selena, I'm getting out my wallet to give you my ID, because that's normally what you do when you get stopped. I mean, I don't have my wallet in my pocket. I have it in a purse. But a lot of people do have it in their pocket, in a wallet. And when you're stopped for what seems to be a traffic issue, you pull out and you say, this is my ID and whatever. And so the timing of this and the allegations of this are very fast. And while I understand that sometimes that does justify the police officer, what shows us that it does here? All right. Let's remember the reason that Officer Hayes was speaking to him from the passenger side over here, because this window apparently wouldn't operate. But Salinas was over there. Salinas was on the driver's side. I'm doing it from my perspective, John. Salinas was on the passenger side. I understand, but you can still hear through the window, not down. I hear a lot of noise when my windows are open. Oh, certainly. And I do, too. I'm just trying to clarify what's going on here. All right. So he's talking to him, and he's yelling at him, stop reaching. Stop reaching. Stop reaching. He says it six times. It's on the video. It's clear. Stop reaching. Salinas over here, although he certainly might have heard him through the window, as you say, you can tell even if there is the potential for some confusion here, the law is not clearly established to say that that doesn't justify an officer believing that this person is pulling out a weapon. And so if Hayes sees what he thinks is a weapon, even if it's not, he's entitled to qualified immunity to use deadly force. Okay. What about this stuff where they threw him on the ground and didn't call the 911 for six minutes and whatever, and we're kind of treating him so angrily when he's been shot five times, and he's obviously not fully with it when you get shot five times. How do you address that? Well, that's mostly conclusory. They pulled him out of the car. Well, 12B6s kind of are. You know, we don't have all of the evidence, and certainly the jury might believe an officer over someone else testifying, but the allegation is that he was thrown on the ground after being shot, well, six times, but five that got in him, and just left there while they wandered around, and they didn't do anything to help him until six minutes later. Because those are factual conclusions, not allegations of exactly what they did. There is no way that they can say that, all right, they pulled him out of the car, put him on the ground, and they called extra officers to come there, and then they called the, four and a half minutes later, they called for... I'm talking about the, you know, Judge Barksdale made very clear, we're talking about the allegations. Your client could ultimately prevail on the actual facts. That's true all the time. The question, though, is the allegations. What is your response to why those allegations aren't sufficient to call into question these people? Even... Or Hayes, actually. Sure. Even if the allegation is they roughed him up, that, in this context, does not create a constitutional violation. It just isn't enough. When the officer perceived his life to be in danger, this all happened very, very, very fast, and so then they get him out... But once someone's shot five times, and they're on the ground, and you can see there's no gun, then you still think your life is in danger? His life is the one that's in danger. Well, there's also a passenger in there, all right, and so, and I don't believe that they alleged anything like the officers were kicking him, anything like that, in terms of roughing him up. They said that they pulled him out... And threw him on the ground. Pardon? And threw him to the ground. I mean... What does throw him to the ground mean? I mean, threw him to the ground. I mean, put him on the ground. So you don't have really any answers. I don't think that that states a claim, or, and he was still, he was still living, and they were trying to control him. Even people, oh my goodness, just as an illustration, Your Honor, even people who have been shot multiple times, and are still alive, can still present a danger. But that's just something to be aware of, that this is an officer's knowledge base. This isn't a case where that occurred, and so we can't, we don't have a video showing that he was still dangerous. What do you do with the fact that it took several minutes just to summon any kind of medical help? It wasn't, I don't, it was four and a half minutes. If they said seven minutes... No, no, no, I said several, several minutes is what I said. Several minutes. Four and a half is several. Okay. I don't believe that shows, I don't think that pleads deliberate indifference to his condition. This is a high stress situation. They don't have another person they have to control and contain over here. But they knew that he'd been shot several times. Yes, and the better thing certainly is one officer there to immediately say, hey, we need an ambulance now. I don't know why it took them, I don't know why it took them longer. But they do have another person over here to contain, and they do have a gun somewhere, which was found in the back seat of the car. And so they don't have to get that ambulance, or they could be shot dead while they're... What will we find anywhere in the record, and I'm not suggesting which parts of the record we should look at, but taking the whole record that we have on this appeal, what does it show about whether there was any kind of initial search of the weapon, and whether a weapon was eventually found? Yes, you're asking where it is in the record that shows that the weapon was found? What does the record tell us, anywhere in the record about, number one, whether there was any kind of initial search inside the car, and number two, whether and how a weapon was eventually found, if one was found? We've cited in our brief the place in the record where it says that the pistol, the handgun was found in the back seat of the car later. And so I don't know just how that timing went. There are also photographs in the record which plaintiffs have supplied. Plaintiffs have speculated that the police have planted this weapon. There's not any evidence of that. But we don't know, excuse me, I'm interrupting you, but I'm just trying to get to this. So we don't know from what you've said whether this was like an inventory search once the car was towed, or whether it was there at the scene, immediately someone was found in the back seat. What do we know from the record about that? I believe it was an inventory search, Your Honor, after the car was towed, that it was found later. Now, I don't know why that would be. I don't know why they wouldn't have found it right then. There are some unanswered questions. I don't believe that those unanswered questions point to a constitutional violation the way they've pleaded it. And if their pleading incorporates the video, the video shows that Officer Hayes had an objective, objectively, reasonably to believe that Mr. Allen was going for a weapon. And if the weapon were in his hand, in his pocket, instead of a wallet, and it came out of his pocket, he could shoot Officer Hayes before Officer Hayes would be able to respond once the weapon was out. Let me ask about the city. You know, normally these claims of ratification are pretty, you know, floppy, frankly. But here he was given an award for killing Mr. Allen, for shooting and killing Mr. Allen. So you may prevail on the case, and that's fine. But if you didn't, wouldn't that be a ratification? First of all, it wasn't a constitutional violation. Killing Mr. Allen was not a violation of his constitutionally protected rights. We don't have the right to do certain things, everything, all the time and not be shot. So he wasn't given an award for killing someone. He was given an award for handling a dangerous He was given an award for his conduct in this case that ended up killing Mr. Allen. So again, I understand there's a long step before we get to ratification. But let's assume they get down that road. Isn't that a ratification to give him an award? I don't see a lot of those. So that's a little bit unusual to me. Maybe it happens all the time. But in the cases I've seen, they don't usually give an award, even if they support the officer in his conduct. So isn't that a ratification? It's not a ratification. It's a ratification of the conduct, I suppose, if that's exactly what they gave it to him for. But it is not a ratification of the constitutional violations because it was not one. And so they haven't pleaded Monell liability against the city. I mean, it's easy to say, well, they violate people's constitutional rights all the time. They shoot people and then they turn out to be unarmed. And so that's a violation of constitutional rights. Well, it's just not. But there are lists of cases that plaintiffs bring up. In this case and other cases, we see these all over the time. And the same cases appear in different complaints. You know, the city has this pattern of letting its officers go out and just shoot people. And it's fine. But none of those lists of cases state a Monell claim because none of them really get into the facts about what led to the shoot, what happened right before it. And if you look at, say, another case, Manus v. Lawson from this court from a few years ago, a man who was parked on a railroad track. And he was asleep. They tried to wake him. And he then got startled and flustered. And he started reaching under his seat. And they said, stop reaching under your seat. Stop reaching under your seat. And he keeps reaching. And then they shot him. And it was fatal. And it wasn't a violation of his constitutional right because you cannot do certain things. When the officer says, stop reaching, you have to do that. This is to protect the officers. This is to protect everybody around. You have to do that. In this case, yes, Mr. Allen came to a full stop. He did. But he was up on the curb. The officers could have reason to think at that point he was halfway up over on the curb. They could have plenty of reason to think this man may not be using good judgment. If you encounter somebody who is either on drugs, as it later turned out that Mr. Allen had a metabolite of cocaine in his system, they didn't know that at the time. But if you encounter someone who you think might be on drugs based on some behavior and how they're driving, or in this case, stopping driving, or on alcohol, that puts an officer a little bit higher on alert because that person is not going to have good judgment about, hey, I better just stop and do what the officer says. That person might be more likely to present and use a weapon against an officer or against someone else there like the passenger in this car. How about stating your position on the request that this case be reassigned? You know, both times around, Judge Hughes viewed the video and he decided, like I'm telling you, that it shows that there was a justification for Officer Hayes to fire. But they do say the video is fake. I'm sorry? They do say the video is fake. It's pled in the pleading. It is. If somebody can plead that there's a fabricated video and that's satisfied pleading standards, it's just astonishing. It's just astonishing. They're referring to a video, they have the original video, they have another video. You can look at both of them because they're both here in the record before you. The fixed video is one that apparently somebody took. I'm sorry, they plead that the defendants later represented that perhaps there was an altered video. I mean, so . . . Anyway, I'm sorry, I didn't let you completely answer Judge Barksdale. Please finish. I'm sorry. Did I answer your question? That's fine. Okay, I'm out of time, so . . . So, finish your statement. You were talking about the two different videos. Sure. Plaintiffs have alleged that there was a tampered video. They have provided a video that they say is tampered. It did not come from us. They have also provided the video we gave to them, which is the original video. The supposedly tampered video is apparently a video of somebody used a cell phone taking a showing of a video on a computer screen. So, this video from the cell phone has different metadata around it, which is what they've been talking about for several years now. It's . . . something's wrong with this because the metadata is different. And we supplied an affidavit in our response to their motion for a relief from judgment, an affidavit from our IT consultant in-house explaining why it looks . . . why you can tell that that's what it is. Um, this Court could direct Judge Hughes to simply follow a straightforward summary judgment proceeding so that there's no issue about getting hung up on just what was pleaded and how much you include the other things that have been referred to. But I don't think there's any reason to send it to another judge. All right. Thank you, Mr. Higginson. Ms. Lewis, you've saved some time for rebuttal. Thank you. Um, there's a few . . . How do you address that bottom line that if you're the officer, you're telling me don't reach in your pocket and I'm still reaching in the pocket and you think I might have a gun that you can then shoot me? How do you address that in the facts of this case? Well, I don't think that the officer, a reasonable officer, would have ever believed that Mr. Allen had a gun based on the type of pants that Mr. Allen was wearing. And if we stick to the complaint, in the facts that are in the complaint, Mr. Allen had his fingers, a few of his fingers in his pocket and a few of them were still sticking out of his pocket. So his index finger, his middle finger, and his thumb were in his pockets. And you can clearly see that there is not a gun, which makes this case much different than Mannis that was referred to by Mr. Higginson. In Mannis, that officer was posed with an issue of a person reaching underneath their seat and that officer could not have known so many things to be underneath a person's seat. But as far as a pocket is concerned and what Mr., excuse me, what Officer Hayes actually stated that he saw, and mind you, he says that it's not what he thought he saw. He emphatically said that he saw a pro-handle gun and Mr. Allen pointed it at him. And that makes all the difference in the world. And I know this court does not necessarily love Hunter B. Cole or Colby Carson. But one of the things in that case was, I think, I believe, I don't know, the tipping point was that the officer was not truthful. And I think here that matters as well because when you say that Mr. Allen actually pointed a gun, it was not a thought anymore. And that, I think, makes the difference here. Now, once again, we're getting so far afield from the third amended complaint, but do you agree that the video and the Hayes affidavit were incorporated in your third amended complaint? I don't, Your Honor. Now, I will say that there are some, we did get, there was information gathered from the affidavit. There was information gathered from the video. But as far as referencing and saying this timestamp, or if you watch the video here, you'll find, or if you look at the affidavit, you'll see that is not in the amended complaint, the live complaint. And as it relates to the live complaint, it does actually state that Mr. Hayes alleged, excuse me, Officer Hayes alleged that Mr. Allen pointed the weapon at him. You just picked some things out of the Hayes affidavit or out of the video and put it in your third amended complaint? Right, we use that as a part of our information and belief. Do you reference the third amended complaint in the affidavit? I'm sorry. We do not refer, we do not say if you review the affidavit or point to the affidavit and reference it. No, Your Honor, we do not. And as it relates, if I could address one other thing, as it relates to the medical care, Mr. Allen, when he was, before he was dragged out of the vehicle and thrown to the ground, they broke his driver's side window. And when they broke the driver's side window, there was, as it was pled, there was, I mean, you did plead there was a false affidavit. It's in there, ROA 1164 to 65. You say the City of Houston and Justine Hayes falsely represented that Mr. Hayes pointed a gun at them. And you began that with submitting a false affidavit or report is improper. I'm sorry, I might have misunderstood and I did not convey that properly. What I meant was we didn't refer to it and say, you know, look at page eight of the affidavit says this. That's what I meant by that. I apologize. But we did, we were able to review the affidavit and gain some facts from the affidavit. As plaintiffs, we don't get a lot of facts. Obviously, before there's a lot of objections to getting public records and so forth. But with us having this information, we were able to use some of the information there. And going back to, going back to this, this notice on the, on the Rule 56, it does allow for us to get discovery. And I think that if we weren't able to get discovery, if the court, I don't want to put the cart before the horse, but if this court were to remand this case, we believe that it should be remanded with an order if the court does so find that we've pled plausible claims, that we also get an order for discovery because we haven't had that. I have, I have a lot of, a lot of cases before Judge Hughes and this is consistent in all of my cases. And this is, this is right in line with the rest of the cases where it just doesn't happen in this court as it relates to my own personal experience. But as far as this case is concerned, that is a concern of mine upon remand is that we will not get discovery if we do get proper notice that this will be converted based on incorporations or anything else that, that's, that the court ultimately ends up finding. And so we would ask that we do, if the court is not inclined to reassign, that the court would issue the order for discovery as the court did in, in Miller, I believe it was Miller and, and the, I'm sorry, Bailey versus K.S. Management in the same district court. And so one, one final, one final thought or note, as far as I believe, you can have 20 seconds. Thank you. The ratification argument, it was based on conduct. It was based on the conduct here. And, and mind you, those individuals at the, the policymakers at the Houston Police Department always had access to the body cam videos. They've always had access to the affidavits. They were able to weigh all that information and still decide to award Mr. Hayes for his actions in the, the hostile, with a hostile encounter award. Thank you, Ms. Lewis. Your case is under submission.